UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

TORRENCE HARRIS, SR.,

Petitioner,

v.

Case No. 24-cv-453-pp

UNITED STATES OF AMERICA,

Respondent.

---

**ORDER DENYING PETITIONER'S MOTION UNDER 28 U.S.C. §2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE (DKT. NO. 1), DECLINING TO ISSUE CERTIFICATE OF APPEALABILITY AND DISMISSING CASE**

---

The petitioner filed a motion under 28 U.S.C. §2255 challenging his March 28, 2023 judgment of conviction. Dkt. No. 1. The petitioner pled guilty to one count of conspiring to possess with intent to distribute heroin, fentanyl and cocaine, and the court imposed a sentence of 144 months. United States v. Harris, *et al.*, Case No. 17-cr-175 (E.D. Wis.), Dkt. Nos. 644, 645. The petitioner did not file an appeal. Harris v. United States, Case No. 24-cv-453, Dkt. No. 1 at 2.

The petitioner filed the instant §2255 motion on April 15, 2024, arguing that his attorney had "failed to file a meritorious suppression motion that would have resulted in the all of the evidence obtained from the wire-taps to be suppressed." Id. at 4. He asserts that the affidavits supporting the wiretaps contained material misstatements and omissions. Id. at 5. The petitioner says that he was misled by his former attorney and did not understand the grounds

for this petition until after he pled guilty. Id. at 9. He asks the court to vacate the judgment, suppress all evidence and schedule a Franks hearing. Id. at 12. The court allowed the petitioner to amend the petition for the sole purpose of filing a "corrected" version of an exhibit. Dkt. No. 13.

Based on the petitioner's plea agreement, his statements to this court—under oath—and the evidence in the record, the court will deny the petitioner's §2255 motion and decline to issue a certificate of appealability.

## I. Background

On October 17, 2017, the grand jury charged the petitioner and eleven others in a thirty-four-count indictment. Harris, Case No. 17-cr-175, Dkt. No. 98. Two years later, the grand jury returned a superseding indictment charging the petitioner and only three others. Id. at Dkt. No. 303. The superseding indictment contained twenty-seven counts, although the petitioner was charged with the same eight charges as those he'd been charged with in the original indictment—a drug conspiracy in Count One, five substantive heroin possession counts (Counts Four through Seven and Count Ten), one substantive count of possession with intent to distribute heroin and fentanyl (Count Twenty-Five) and one count of being a prohibited person in possession of a firearm (Count Twenty-Six). Id.

Shortly after the petitioner's May 29, 2020 arrest, Attorney Mark D. Richards filed a notice of appearance on the defendant's behalf. Id. at Dkt. No. 395. Soon after, Richards filed a motion to suppress illegally obtained surveillance footage, a motion grounded in the Fourth Amendment. Id. at Dkt.

No. 462. This court adopted Judge Duffin's recommendation that it deny the motion. Id. at Dkt. No. 491.

Almost a year later, the petitioner signed a plea agreement. Id., Dkt. No. 509 at 17. He agreed to plead guilty to Count One of the superseding indictment, which charged him with conspiring to possess with intent to distribute heroin, fentanyl and cocaine. Id. at ¶4. In the plea agreement, the petitioner acknowledged that he had read and understood the charges, the elements of the charges and the terms and conditions of the plea agreement. Id. at ¶3-4. In the waiver of rights section of the plea agreement, the petitioner acknowledged that "he surrender[ed] any claims he may have raised in any pretrial motion." Id. at ¶31. In the last paragraph of the plea agreement, the petitioner acknowledged that he understood and agreed that he was pleading guilty "freely and voluntarily because he [was] in fact guilty" and that "no threats, promises, representations, or other inducements ha[d] been made, nor agreements reached, other than those set forth in this agreement." Id. at ¶41. On the signature page, the petitioner acknowledged the following:

> I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Id. at 17. Attorney Richards confirmed that he "carefully [had] reviewed every part of this agreement with the [petitioner]" and that the petitioner's "decision to enter into this agreement [was] an informed and voluntary one." Id.

During the April 20, 2021 plea hearing, the court confirmed that the petitioner had signed the plea agreement on March 2, 2021 and that his attorney had reviewed and explained the agreement to the petitioner. Dkt. No. 579 at 11–12. The petitioner told the court that he had enough time to ask his attorney questions regarding the plea agreement and the waiver of certain constitutional rights and confirmed that he was "satisfied" with his attorney's representation. Id. The court found that the petitioner was entering his plea knowingly, voluntarily and intelligently and that he understood the rights that he was giving up. Id. at 44–45.

On July 8, 2021—about a week before the scheduled sentencing hearing—the court received from the petitioner a letter. Id. at Dkt. No. 559. The letter asked that Richards be removed from the petitioner's case, alleging that Richards had "misled" the petitioner regarding a "vital" portion of his defense. Id. On July 12, 2021, the court issued an order granting that motion. Id. at Dkt. No. 563.

On July 15, 2021, Attorney Eric Maciolek appeared on the petitioner's behalf. Id. at Dkt. No. 564. After filing several status reports, Maciolek filed a motion to withdraw. Id. at Dkt. No. 587. Four days later, the court received from the petitioner a letter, stating that he believed that Maciolek may have sabotaged his case and "harmed him irreparably." Id., Dkt. No. 591 at 2. The

petitioner argued that Maciolek had failed to independently research and review the records on an issue that the petitioner raised (and that Richards had failed to uncover) and instead had elected to discuss the issue with the government. Id. at 1-2. The court granted Maciolek's motion to withdraw and gave the defendant time to find a retained attorney. Id. at Dkt. No. 592.

On February 25, 2022, Attorney Chris Donovan filed a notice of appearance for the petitioner. Id. at Dkt. No. 617. Donovan represented the petitioner at the March 16, 2023 sentencing hearing. Id. at Dkt. No. 644. After the petitioner accepted "full responsibility" for his actions and acknowledged that he "played an integral role in the conspiracy," the court sentenced the petitioner to 144 months of imprisonment followed by four years of supervised release. Id. The court entered judgment on March 28, 2023. Id. at Dkt. No. 645. The petitioner never filed a motion to withdraw his plea and never filed an appeal.

## II. Motion to Vacate, Set Aside or Correct Sentence (Dkt. No. 1)

### A. Petitioner's Brief in Support of His Motion (Dkt. No. 14)

The petitioner filed several briefs in support of his petition, but states that his brief filed on March 14, 2025 "is the only brief that he wishes to have considered." Harris, Case No. 24-cv-454, Dkt. No. 14 at 2. The petitioner argues that Attorney Richards violated his Sixth Amendment rights when Richards (1) failed to investigate the petitioner's concerns about a Fourth Amendment violation; (2) failed to prepare and file a motion to suppress; (3)

lied to the petitioner about investigating the petitioner's concerns; and (4) induced the petitioner to plead guilty. Id. at 3.

According to the petitioner, he reviewed the discovery prior to his plea and told Richards that he did not know Clifton Morrison and was not a member of the Morrison drug trafficking organization (DTO) "that the government was accusing petitioner of being connected to." Id. at 4. The petitioner says Richards told him that he didn't have to know everyone in the conspiracy to be found guilty on a conspiracy charge. Id. According to the petitioner, Richards told him at their next meeting that Richards had looked into the warrants and that "they were all good." Id. Although Richards filed a motion to suppress video footage, the petitioner says that he could not understand why they would waste time on an "insignificant argument" that had already been "shot down" by the court. Id.

The petitioner says that Richards presented him with the plea agreement and pressured him by saying that there was short time limit and that the petitioner had to decide right away or the government could withdraw the plea agreement and seek career offender status. Id. at 6. The petitioner says that after he pled guilty, Richards seemed motivated to get the case over with and spent no time "prepping" the petitioner for the interview with the probation office for the presentence report. Id. The petitioner says that he lost his trust in Richards when Richards pushed for a virtual sentencing hearing and allegedly told the petitioner that an in-person hearing would require that the petitioner "be vaccinated for Court and would result in an indefinite delay in the

proceedings." Id. at 7. After that, the petitioner asked the court to appoint new counsel. Id. The petitioner says that he researched wiretap laws on his own and discovered that a motion to suppress would have been meritorious. Id. at 7-8.

The petitioner believes he is entitled to a Franks hearing.[1] Id. at 10. He argues that Luke Hepp, the agent who filed the affidavit in support of the wiretap application, had a scheme to "take a ready-made wiretap application, that was developed based on the legitimate investigation into Clifton Morrison and his drug trafficking organization, and include into it the names of the petitioner's and [Terrence] Hamlin's as Target Subjects in order to make it easier to gain court ordered wiretap permission for their phones." Id. at 11. The petitioner argues that Hepp's affidavit was a "Trojan Horse" to invade his privacy and that in the subsequent affidavits, Hepp "gather[ed] enough evidence, through the ill-gotten wiretaps, to eventually indict the petitioner and Hamlin separate from the actual Morrison DTO." Id. at 11. The petitioner says that the only thing connecting him to the Morrison DTO is Hepp. Id. at 12. The petitioner believes that the investigators' case reports would support his position because none mention "this alleged connection to Morrison DTO." Id. at 13. The petitioner "swears" that he does not know Morrison and had never heard of him before the indictment. Id. at 15. He points out that the case reports connect him to Hamlin—not Morrison. Id.

[1] Franks v. Delaware, 438 U.S. 154, 155-56 (1978)

The petitioner argues that it is impossible for the telephone analysis to reveal that he obtained large quantities of heroin from the Morrison DTO. Id. at 14-15. The petitioner says that there are at least twenty instances in the "3-30-17 Affidavit" in which Hepp repeats that Hamlin and/or the petitioner allegedly were connected to Morrison. Id. at 17. The petitioner says that Hepp "[made] an effort to create the narrative that petitioner [was] Hamlin's source of supply" and identifies omissions that he says undermine the application. Id. at 19. For example, the petitioner says that Hamlin is never seen getting out of the vehicle or meeting anyone at the location "believed to the be the residence" of the petitioner. Id. at 19. The petitioner says that Hamlin was "witnessed by agents at a different residence" and that the petitioner never was positively identified as meeting with Hamlin. Id. at 19-20. The petitioner argues that the agents were able to uncover a second likely source of supply during physical surveillance and it was not the petitioner. Id.

At the end of his brief, the petitioner requests discovery. Id. at 26. Specifically, he asks for all field agents' case reports from August of 2015 through the end of 2017. Id. The petitioner believes the reports will show that agents never uncovered evidence that the petitioner and Hamlin were part of the Morrison DTO. Id. at 27. Additionally, he wants all seven of the wiretap search warrant applications and affidavits and would like to serve interrogatories. Id. at 27-28.

The petitioner filed a six-page affidavit in which he avers that he told Attorney Richards in 2020 that he did not know Clifton Morrison or have any

connection to the Morrison DTO. Dkt. No. 15 at ¶1. He avers that Richards told him that he would look into the search warrants, id. at ¶2, but never went over the wiretap affidavits with the petitioner, id. at ¶3. He avers that Richards told him that the warrants "looked good." Id. at ¶5. The petitioner avers that Richards told him that it was in the petitioner's best interest to sign the plea agreement because the wiretap evidence would be admissible at trial. Id. at ¶6. The petitioner avers that he wanted an in-person sentencing but that Richards said it wouldn't make a difference. Id. at ¶¶9, 10.

In the same affidavit, the petitioner avers that he found out that the government used "the false Clifton Morrison connection claim" as a basis for the wiretap search warrant. Id. at ¶16. He says that he made Attorney Maciolek aware of the issue but that Maciolek never took him seriously. Id. at ¶¶17, 18. The petitioner explains that he hired Attorney Donovan who advised him to proceed with sentencing. Id. at ¶20. The petitioner states that the only thing he has in common with Morrison is Agent Luke Hepp and that he never received drugs from Morrison. Id. at ¶¶24-25, 27. He also avers that Hepp included his name to "skip the steps that had been taken in the Morrison investigation and jumpstart his investigation into a [the petitioner] drug trafficking organization." Id. at ¶28.

The petitioner avers that the field reports detailing an October 20, 2015 controlled buy show that he and Hamlin never met prior to the controlled buy, that Hamlin met someone else prior to the controlled buy and left holding a "small white package covered in plastic" and that the petitioner was not

positively identified as the person agents witnessed Hamlin meet. Id. at ¶33. The petitioner adds that "case agent field reports and police reports from the West Allis Police Department contained in the discovery" reveal that "CS-4 lied to investigators and that Hepp covered up for this lie while vouching for CS-4s credibility in the 3-30-17 affidavit." Id.

B. Respondent's Brief in Opposition (Dkt. No. 22)

The respondent opposes the motion on the ground that the claims are contradicted by the plea agreement, by the petitioner's statements during the plea colloquy and by the declaration of his former counsel. Dkt. No. 22 at 1. The respondent says that the petitioner's "number one problem is that he is running away from the admissions he made under oath during his change-of-plea colloquy." Id. at 6. The respondent cites Seventh Circuit authority holding that a defendant's representations at the plea hearing are presumed to be truthful and are considered binding when a defendant seeks to make contrary claims in support of a §2255 motion. Id. (citing United States v. Martinez, 169 F.3d 1049, 1054 (7th Cir. 1999)).

The respondent points out that the petitioner admitted in his plea agreement that agents put together a case against him based on calls and text messages intercepted with court authorization, along with surveillance and evidence obtained through search warrants. Id. at 7. The respondent emphasizes that the petitioner admitted that he was responsible for the distribution of "at least one kilogram but less than three kilograms of heroin, between 32 and 40 grams of fentanyl, and an unspecified amount of cocaine

'because these amounts were reasonably foreseeable to him based on his own or the co-conspirators' jointly undertaken criminal activity.'" Id. (citing Harris, Case No. 17-cr-175, Dkt. No. 509 at ¶5). The respondent adds that the petitioner confirmed that he was pleading guilty "freely and voluntarily because he [was] in fact guilty." Id. (citing Case No. 17-cr-175, Dkt. No. 509 at ¶41). The respondent recounts that the petitioner affirmed the following statement:

> I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Id. (citing Case No. 17-cr-175, Dkt. No. 509 at 17).

The respondent points to the court's colloquy with the petitioner at his change-of-plea hearing, confirming that the petitioner had reviewed the terms of the plea agreement with his lawyer, was satisfied with his lawyer's representation and chose to enter a plea freely and voluntarily. Dkt. No. 22 at 8. The respondent argues that the petitioner had sufficient education and experience with the criminal justice system and never was equivocal or unclear in his responses. Id. The petitioner confirmed that he had enough time to review the plea agreement with Richards. Id. The respondent points out that when asked by the court, the petitioner confirmed that he felt the plea was his best option. Id.

Addressing the petitioner's arguments about his lawyer not investigating the factual basis for the Title III wiretap affidavits, the respondent argues that the petitioner has not shown that "it was sub-par lawyering [for his lawyer] to forego a challenge to the wiretap evidence." Id. at 9. The respondent argues that "Attorney Richards, who was no stranger to T-III evidence, reviewed the T-III affidavits in discovery with care and 'observed nothing irregular or deficient about [them], nor anything that caused [him] to question the authorizing judge's determination that they in fact established probable cause.'" Id. (citing Dkt. No. 23 at ¶¶ 3-5, 10). In addition, the respondent points out that Richards, in his declaration, avers that "nothing that [the petitioner] relayed to [Richards] about his case seriously called into question the veracity of the T-III affidavits, or suggested that further investigation might provide a basis for challenging them." Id. (citing Dkt. No. 23 at ¶11).

The respondent argues that the petitioner has failed to explain the significance of his claim that he did not know Morrison and has failed to explain what his attorney was supposed to have done to investigate and prove it. Id. at 9-10. The respondent says that the petitioner has failed to clearly explain how not knowing Morrison would have led to suppression of the wiretap evidence. Id. The respondent argues that it wasn't the petitioner's knowledge of Morrison, but rather the connections between the various subjects of the investigation, that justified the wiretap. Id. In any event, the respondent emphasizes that the important question is "not whether probable cause existed for the T-III wiretaps . . .. The question is whether [the petitioner]

has met his burden of showing that his lawyer was ineffective for advising that [the petitioner] forego litigation over the wiretaps in favor of recommending a plea." Id.

Ultimately, the respondent argues that the petitioner cannot show prejudice. Id. at 10-11. The respondent says that the government could have added charges relating to the petitioner's flight from prosecution and could have filed an information under 21 U.S.C. §851 based on the petitioner's criminal history. Id. Citing the petitioner's co-defendant's conviction, the respondent says that the government could have obtained a conspiracy conviction without the wiretap. Id. at 11 (citing United States v. Royel Page, Case No. 17-cr-175 (E.D. Wis.), Dkt. No. 613 at 2-16). According to the respondent, co-defendant Terrence Hamlin's testimony "would likely have established [the petitioner's] guilt as to multiple substantive counts of distribution." Id. The respondent adds that without the agreement to dismiss the firearms count, the petitioner "would almost certainly have been convicted of that offense—again with or without the wiretap evidence." Id. The respondent observes that in the absence of the plea agreement, the government "would not have been obligated to recommend acceptance points or cabin its overall sentencing recommendation." Id. The respondent emphasizes that even without Richards's declaration, the transcript from the petitioner's plea hearing "makes clear that the [petitioner] was satisfied with his representation and had no lingering, unaddressed concerns about the T-III affidavits" when he entered his plea. Id. at 12. The respondent argues that the petitioner's self-serving

allegations at this stage cannot satisfy his burden to obtain post-conviction relief. Id. (citing Martinez, 169 F.3d at 1054; Hugi v. United States, 164 F.3d 378, 381-82 (7th Cir. 1999)).

As a final matter, the respondent argues that the petitioner is not entitled to an evidentiary hearing because the only factual dispute is between the petitioner's representations in his plea agreement and under oath at the plea hearing and his current, self-serving allegations. Id.

C. Petitioner's Reply (Dkt. No. 27)

In his reply brief, the petitioner reiterates that counsel was ineffective for failing to investigate the petitioner's concerns that he had no connection to Morrison, failing to file a meritorious suppression motion and advising the petitioner to plead guilty. Dkt. No. 27 at 1. He cites paragraph 11 of Attorney Richards's declaration, which states that "nothing that [petitioner] related to me about his case seriously called into question the veracity of the T III affidavits or suggested that further investigation might provide a basis for challenging them" and paragraph 12, which states that "[w]e discussed the interconnection between the various individuals who had been investigated by the government." Id. at 2. The petitioner argues that this is proof he made Richards aware that he had no connection to Morrison. Id. He insists that it was Richards's responsibility to uncover the "deliberate or reckless lies or omissions" because Richards had "'lengthy' experience of 'handling many drug cases in federal court, including complex cases that were investigated utilizing phone wiretaps,' to use." Id.

The petitioner emphasizes that Richards averred that he reviewed the T-III materials carefully but did not state that he had reviewed the materials "IN CONCERT with the petitioner." Id. at 3. He says that "simply reading through the affidavits and assuming that everything the government says is true doesn't suffice as a 'reasonable' investigation." Id. The petitioner accuses Richards and the government of ignoring the fact that the wiretap permission requires a "necessity" determination. Id. According to the petitioner, the fastest way for the government to refute his arguments would be to show his connection to Morrison and the Morrison DTO or show why those statements were not material. Id. The petitioner believes that the reason the government did not choose that path is because they are unable to refute his arguments. Id. He says that in his brief in support, he laid out very specific facts related to why his alleged connection to Morrison was false and why it was material to the "necessary determination;" he says that without this false information, the court would "have unlikely granted wiretap permission." Id. at 4.

As for prejudice, the petitioner says that the government's entire case against him rested on the ability to wiretap his phone. Id. at 5. He says that without the recorded conversations there is no evidence of his involvement in the drug conspiracy beyond Hamlin's word, which, "at best, can be described as unreliable and biased based on the fact that evidence exists, via filed agents case report, that shows that Hamlin had at least 2 different drug sources that were not the petitioner or connection to the petitioner in any way." Id. The petitioner adds that the firearm was found in the "stash house" and the search

warrant for that house relied on evidence derived from the wiretap. Id. The petitioner argues that it was impossible to prove that he had knowledge of the firearm because he was not found "in actual possession" and other individuals frequented the stash house. Id.

Finally, the petitioner addresses the argument that his statements in the plea colloquy undermine his claims. Id. at 6. He says that he was unaware at the time of his plea that his rights had been violated so "it should be no surprise" that he said he was satisfied with Richards at the plea hearing. The petitioner asserts that none of his arguments now are inconsistent with the representations he made at the time of the plea. Id. He argues that he is entitled to an evidentiary hearing and that his brief meets the standard for granting a Franks hearing. Id. at 7. He intends to ask "2 very simple questions:" "1) [w]hat reasons did the government have to believe that the petitioner and/or Terrance Hamlin were part of Clifton Morrison's large scale DTO?; and 2) [w]hat evidence does the government have to support this claim that precedes the 3/31/17 date listed on the initial wiretap affidavit that sets the stage for the rest that followed?" Id. The petitioner believes that the answers to these questions will "conclusively make or break" his argument. Id.

D. Legal Standards

1. *Section 2255*

A petitioner seeking relief under §2255 must allege either that his sentence violated the Constitution or laws of the United States, that the court was without jurisdiction, that the sentence exceeded the maximum authorized

by law or that the sentence is otherwise subject to collateral attack. 28 U.S.C. §2255(a). "Relief under § 2255 is available 'only in extraordinary situations, such as an error of constitutional or jurisdictional magnitude or where a fundamental defect has occurred which results in a complete miscarriage of justice.'" United States v. Coleman, 763 F.3d 706, 708 (7th Cir. 2014) (quoting Blake v. United States, 723 F.3d 870, 878–79 (7th Cir. 2013)). Relief sought under Section 2255 is extraordinary because it seeks to reopen the criminal process to a person who has already had the opportunity of full process. Almonacid v. United States, 476 F.3d 518, 521 (7th Cir. 2007).

A court may deny a Section 2255 motion without an evidentiary hearing if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. §2255(b). For that reason, the Seventh Circuit has said that a district court need not hold an evidentiary hearing "if the petitioner makes allegations that are vague, conclusory, or palpably incredible, rather than detailed and specific." Bruce v. United States, 256 F.3d 592, 597 (7th Cir.2001) (quotation marks omitted).

2. *Ineffective Assistance of Counsel*

To prevail on an ineffective assistance of counsel claim, the petitioner must show that (1) his counsel's performance was deficient and (2) that he was prejudiced by deficiencies in his counsel's performance. Strickland v. Washington, 455 U.S. 668, 687 (1984). To show deficient performance, the petitioner "must show that counsel's representation fell below an objective standard of reasonableness." Id. at 688. An attorney "need not be perfect,

indeed not even very good, to be constitutionally adequate." Dean v. Young, 777 F.2d 1239, 1245 (7th Cir. 1985). "A strategic decision, even if clearly wrong in retrospect, cannot support a claim that counsel's conduct was deficient." United States v. Yancey, 827 F.2d 83, 90 (7th Cir. 1987).

This same test applies to "challenges to guilty pleas based on ineffective assistance of counsel," Hill v. Lockhart, 474 U.S. 52, 58 (1985), in a more refined way, see United States v. Smith, 989 F.3d 575, 581 (7th Cir. 2021). To assess counsel's effectiveness at the plea stage, the performance prong remains largely unchanged: the petitioner "must allege that he entered the plea agreement based on advice of counsel that fell below constitutional standards." Hurlow v. United States, 726 F.3d 958, 966-67 (7th Cir. 2013). On the prejudice prong, the petitioner must show "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill, 474 U.S. at 59; see also Smith, 989 F.3d at 581; United States v. Cieslowski, 410 F.3d 353, 359 (7th Cir. 2005). "It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding. Counsel's errors must be so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Harrington v. Richter, 562 U.S. 86, 104 (2011). The errors must render the proceeding "fundamentally unfair or unreliable." Blake v. United States, 723 F.3d 870, 879 (7th Cir. 2013).

E. <u>Discussion</u>

Prior to entering his guilty plea, the petitioner reviewed discovery and told Attorney Richards that he did not know Morrison or the Morrison DTO. The petitioner then signed a plea agreement and made representations to this court about the conspiracy to which he was pleading guilty. The petitioner asserts that "NONE of the petitioner's allegations made in his 2255 petition are inconsistent with the factual basis for his plea or the statements he made under oath during the Rule 11 colloquy." Dkt. No. 27 at 6. So the court will begin with petitioner's statements—made under oath—because they directly acknowledge the phone interceptions and the petitioner's leadership role in the conspiracy count to which he pled guilty. The court then will address the petitioner's attempts to sidestep those statements by arguing that he didn't realize at the time of the plea that the government used information it had obtained about the Morrison conspiracy to gain access to telephone calls between himself and others who were involved in drug distribution.

1. *Plea Agreement and Colloquy*

After the petitioner discussed his concerns about the discovery with Richards, he agreed to plead guilty to one of the eight counts in the superseding indictment. <u>Harris</u>, Case No. 17-cr-175, Dkt. No. 509. The agreement included a waiver of rights surrendering "any claims [the petitioner] may have raised in any pretrial motion." <u>Id.</u> at ¶31. The agreement also directly addressed the orders signed by various judges authorizing the interception of

communications over his phone and the information that the government gained from those interceptions:

> During the course of this investigation, various district court judges signed order authorizing the interception of communications over telephone used by Terrence HAMLIN and [THE PETITIONER]. Interception of wire communications over telephone number (414)745-xxxx, Target Telephone #1, used by HAMLIN, began on March 30, 2017, and continued until June 29, 2017, with the exception of a few days. During the court-authorized monitoring of these communications, more than 4,285 intercepted telephone calls and text messages to or from Target Telephone #1 were deemed pertinent and criminal in nature. These intercepted communications confirmed that Terrence HAMLIN obtained heroin and/or cocaine from [THE PETITIONER]. HAMLIN, in turn, distributed the narcotics to mid-level distributors as well as suspected street-level users.
>
> After obtaining communications over HAMLIN's phone, agents were able to determine that [THE PETITIONER] was using telephone number (904) 645-xxxx, Target Telephone #3, and the authorization of interception of wire communications over this telephone was authorized on April 28, 2017. From April 28, 2017 through September 19, 2017, with the exception of a handful of days, the interception of wire communications were also authorized over the following telephone numbers, all believed to be used by [THE PETITIONER]: (904) 732-xxxx, Target Telephone #5; (262) 307-xxxx, Target Telephone #7; (773) 398-xxxx, Target Telephone #12; (262) 289-xxxx, Target Telephone #13; (773)383-xxxx, Target Telephone #14; (312) 931-xxxx, Target Telephone #16; and (414) 399-xxxx, Target Telephone #17. During the court-authorized monitoring of these communications, more than 1,213 intercepted telephone calls and text messages to or from Target Telephones ##3, 5, 7, 12, 13, 14, 16, and 17 were deemed pertinent and criminal in nature. These intercepted communications confirmed that [THE PETITIONER] distributed narcotics to several mid-level distributors.
>
> Case agents also discovered that, in addition to the above, [THE PETITIONER] used multiple telephone numbers, both known and unknown to case agents. For example, on June 14, 2017, case agents conducted surveillance of [THE PETITIONER]. During this surveillance, [THE PETITIONER] was observed speaking on a flip-type cellular telephone. Case agents did not intercept any activity over Target Telephone #3, Target Telephone #5, or Target Telephone #7. Minutes later, [THE PETITIONER] was observed speaking on a

> smart cellular telephone. Again, case agents did not intercept any activity over the above referenced Target Telephones. Subsequent toll analysis revealed that there was no activity over Target Telephone #12 either, leading case agents to believe that [THE PETITIONER] used at least five cellular telephones at that particular time. Case agents are aware that narcotics traffickers often use multiple telephones in an attempt to thwart law enforcement's efforts at identifying them, their customers, and/or suppliers.

Id. at ¶5.

The petitioner admitted that he was responsible for the distribution of at least one kilogram but less than three kilograms of a mixture and substance containing heroin, at least thirty-two grams but less than forty grams of a mixture and substance containing fentanyl and an unspecified amount of cocaine. Id. at ¶17. The petitioner agreed to a 4-level increase to his base offense level under the Sentencing Guidelines because he was an "organizer or leader of criminal activity that involved five or more participants." Id. at ¶19. The petitioner agreed to a 2-level increase because the offense involved a firearm. Id. at ¶20. The petitioner stated that he understood that he could be questioned under oath about the offense and that his answers later could be used in a prosecution for perjury or a false statement. Id. at ¶32. The petitioner acknowledged and agreed that he was pleading guilty freely and voluntarily because he was in fact guilty. Id. at ¶41. Under "Acknowledgements," the petitioner represented that he had discussed all aspects of the case with his attorney and that he was satisfied that his attorney provided effective assistance of counsel. Id. at 17.

The petitioner's statements during the plea colloquy also establish that his plea was knowingly, voluntarily and intelligently entered. The petitioner

stated that he had a GED and had been to college for accounting classes. Id. at 5. The petitioner stated he had never been diagnosed with or taken medication for a mental or emotional problem. Id. at 8. The petitioner confirmed that he had gone over the entire plea agreement with Richards and had enough time to ask any questions that he had about it. Id. at 11-12. He also told the court that he felt he had enough time to talk with Richards about the case generally and his options and that he felt satisfied with the work Richards had done for him as his lawyer. Id. at 12. Again, these statements were made after the petitioner says that he spoke with Richards about not knowing Morrison and that Richards told him that there was no basis to bring a motion.

The court asked the government during the plea hearing to summarize the evidence that it would have presented at trial, and Assistant United States Attorney Gail Hoffman included a discussion of the telephone interceptions:

> Beginning at least in 2015, law enforcement authorities learned that [the petitioner] and others were distributing heroin and cocaine and other substances in and around Milwaukee. To further the investigation, law enforcement authorities obtained court authorization to intercept various telephones including those of [the petitioner]. [The petitioner] used multiple telephones to conduct his drug-trafficking activities, and approximately over 1,000 calls were intercepted which were deemed criminal and pertinent in nature.
>
> The investigation further identified that, in addition to distributing heroin and cocaine to other defendants in this conspiracy, the defendant used Michael Davis and Fontae Kelly as couriers to distribute controlled substances on his behalf. They were also allowed to access [the petitioner's] stash apartment where a gun and controlled substances were kept.
>
> On a number of instances, as outlined in these facts, calls were intercepted which revealed that [the petitioner] distributed heroin and/or cocaine to Terrence Hamlin, among other individuals -- under other individuals. Oftentimes the individuals met [the

> petitioner] and the couriers at Kings and Queens full salon, service salon, or they met him at the Skybox which is a bar located in the area of Martin Luther King Drive. And those -- lot of those calls are detailed.
>
> Ultimately on September 27th, 2017, various search and arrest warrants were executed and [the petitioner's] residence and the stash apartment controlled by [the petitioner] were searched. In [the petitioner's] Chevrolet Impala that he had been observed driving on multiple occasions authorities recovered approximately $69,211 in drug proceeds. At the stash location on Martin Luther King Drive, Apartment B-41, authorities located 10 ounces of heroin, 33 grams of fentanyl, a kilo press, a grinder, a Glock 22 .40 caliber pistol, and the pistol was recovered in a kitchen cabinet above the sink where the heroin was contained.
>
> Based upon the evidence presented in this case, the defendant agrees that he's responsible for at least 1 kilogram but less than 3 kilograms of a mixture and substance containing heroin, at least 32 grams but less than 40 grams of a mixture and substance containing fentanyl, and an unspecified amount of cocaine.

Dkt. No. 579 at 29-30. The petitioner confirmed that those were the facts to which he was pleading guilty. Id. at 31. The petitioner entered his guilty plea, id. at 44, and the court found the plea to be knowingly, voluntarily and intelligently entered. Id. at 44-45.

Representations made to a court during a plea colloquy are presumptively true, Hurlow, 726 F.3d at 968 (quoting United States v. Chavers, 515 F.3d 722, 724 (7th Cir. 2008)), and the petitioner has not rebutted that presumption. See also Key v. United States, 806 F.2d 133, 136 (7th Cir. 1986) ("[T]he representations of the defendant [at a plea hearing] as well as any findings made by the judge accepting the plea[ ] constitute a formidable barrier in any subsequent collateral proceeding.") (quoting Thompson v. Wainwright, 787 F.2d 1447, 1460 (11th Cir. 1986)). The petitioner asserts that none of his

current arguments "are inconsistent with the factual basis for his plea or the statements he made under oath during the Rule 11 colloquy." Dkt. No. 27 at 6. That means he is not disputing what he told the court in the plea colloquy or in the plea agreement.

2. *Ineffective Assistance of Counsel Claims*

In raising his ineffective assistance of counsel claims, the petitioner doesn't say that he didn't understand the waiver of his right to file a pretrial motion or that counsel was ineffective in negotiating a plea. But the court must liberally construe the petitioner's allegations and waivers cannot be invoked where counsel was ineffective in the negotiating process, Long v. United States, 847 F.3d 916, 920 (7th Cir. 2017). The petitioner argues that before Richards advised him to plead guilty, Richards should have fully investigated the petitioner's Fourth Amendment claims and learned that a suppression motion was meritorious, which would have changed the outcome in the petitioner's favor. Dkt. No. 14 at 8. One could construe the petitioner's argument as stating that Richards's performance tainted the plea agreement. But that construction would not end the analysis, because "[n]ot every claim of ineffective assistance of counsel can overcome a waiver in a plea agreement." Id. (quoting Hurlow, 726 F.3d at 964). The Seventh Circuit has not allowed "broad unsupported assertions of ineffective assistance" to circumvent a waiver. Id.

The petitioner argues that the easiest way for the government to put his ineffective assistance of counsel claims to the test would have been to prove that the petitioner knew Morrison or prove that any reference to Morrison in

the affidavit(s) was not material. Dkt. No. 27 at 3. But it is the *petitioner* who carries the burden to prove an ineffective assistance of counsel claim. The *petitioner* must show both deficient performance and resulting prejudice. Strickland, 466 U.S. 668.

The petitioner's ineffective assistance claims are predicated on his belief that he had a "likely meritorious" motion to suppress that Richards should have investigated. Id. at 3. "Likely" doesn't satisfy the petitioner's burden. As the Seventh Circuit explained:

> When a petitioner alleges that counsel was ineffective for failing to move to suppress evidence, we require him to "prove the motion was meritorious." *United States v. Cieslowski*, 410 F.3d 353, 360 (7th Cir. 2005). And when the purported deficiency is based on a failure to investigate, we require the petitioner to allege "what the investigation would have produced." *Richardson v. United States*, 379 F.3d 485, 488 (7th Cir. 2004) (per curiam) (quoting *Hardamon v. United States*, 319 F.3d 943, 951 (7th Cir. 2003)).

Long v. United States, 847 F.3d 916, 920 (7th Cir. 2017).

It is also necessary to clarify the legal standards that would have applied to any motion to suppress or motion for a Franks hearing. The petitioner argues that his motion "is not based on probable cause but on necessity," and that it is still subject to the FRANKS analysis." Dkt. No. 14 at 10. A government application for a wiretap must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. §2518(1)(c). The Seventh Circuit has clarified that the wiretap statute does not require "literal necessity:"

> To be clear, the wiretap statute does not require literal "necessity." The statute "was not intended to ensure that wiretaps are used only as a last resort in an investigation, but rather that they are not to be routinely employed as the initial step in a criminal investigation." *Mandell*, 833 F.3d at 821, quoting *United States v. McLee*, 436 F.3d 751, 762–63 (7th Cir. 2006). The government's burden of establishing that normal methods have not worked or are unlikely to work or would be too dangerous "is not great," and we consider its supporting evidence "in a practical and common-sense fashion." *Id.*, quoting *McLee*, 436 F.3d at 763.

United States v. Jones, 56 F.4th 455, 473 (7th Cir. 2022). To the extent the petitioner believes that Richards should have uncovered a basis for a Franks hearing, he would have had to make a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." Franks, 438 U.S. at 155. Then, "if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." Id.

With that, the court turns to the petitioner's arguments about Richards's performance. The petitioner's theory is that Agent Luke Hepp used his investigation into Morrison and the Morrison DTO to easily gain access to the petitioner's and Hamlin's phones. Dkt. No. 14 at 11. The petitioner says that he is prepared to make a "substantial preliminary showing and identify specific portions of the affidavits that contain intentional and/or reckless misrepresentations." Id. at 12. But his "proof" is to reject any assertion that he knew or was linked to Morrison. Id. at 12-18. His affidavit states that (1) he told Attorney Richards that he did not know Morrison and had no connection to Morrison's DTO, dkt. no. 15 at ¶1; (2) Richards told him that he (Richards)

looked into the wiretap warrants and that the warrants "looked good," id. at ¶5; (3) the petitioner discovered that the government used a false Clifton Morrison connection claim as a basis for the wiretap warrant, id. at ¶16; and (4) that nothing in the discovery supports a claim that the petitioner distributed heroin for the Morrison DTO, id. at ¶22.

Meanwhile, Richards filed a declaration stating that he "did review the TIII materials, carefully," and "observed nothing irregular or deficient about the affidavits" and nothing that would cause him to question the probable cause determination. Dkt. No. 22-1 at ¶10. Richards declares that he consulted with the petitioner about the discovery and possible motions and that nothing the petitioner relayed to him "called into question the veracity of the TIII affidavits, or suggested that further investigation might provide a basis for challenging them." Id. at ¶11. Richards avers that he and the petitioner discussed the interconnections between the various individuals who had been investigated by the government, ultimately leading to the petitioner; Richards avers he explained to the petitioner that there was "no basis for challenging probable cause for the T-III wiretaps" and the petitioner agreed not to pursue any challenges. Id. at ¶12. Richards does not recall the petitioner ever stating that the affidavits supporting the TIII authorization contained deliberate or reckless omissions—or material ones—on the part of the affiant that would necessitate a Franks motion. Id. at ¶13.

Even if the court sets aside Richards's declaration and focuses solely on the allegations in the petitioner's motion and briefs and the statements in his

affidavit, the petitioner acknowledges that he had a conversation with Richards about Morrison and that Richards reviewed the warrants and said that they looked good. Dkt. No. 15 at ¶¶5, 6. The petitioner admits that Richards told him that a guilty plea was in his best interest because the wiretap evidence would be admissible at trial. Id. at ¶6. The petitioner asserts that the only reasonable investigation would have been for Richards to review the TIII materials "IN CONCERT with the petitioner or with the petitioner's concerns in mind." Dkt. No. 27 at 3. The Seventh Circuit has held that an attorney need not investigate every possible factual scenario. Long, 847 F.3d at 922. In determining reasonableness, the court focuses on what the petitioner told trial counsel. Id. By his own admission, the only thing that the petitioner told counsel was that he did not know Morrison. He relies on nothing more than bare assertions to support his claim.

The petitioner had multiple opportunities to raise this issue prior to the court entering judgment. The petitioner asked the court to remove Richards from the case after "becoming aware that he intentionally misled [the petitioner] regarding a vital portion of [the petitioner's] defense." Harris, Case No. 17-cr-53, Dkt. No. 559. The petitioner then had two other attorneys after Richards withdrew. Attorney Maciolek, the petitioner's second lawyer, filed a report with the court prior to sentencing stating that he visited the petitioner in the Waukesha County Jail on November 2, 2021 and informed the petitioner that "legal grounds to file a motion to withdraw his guilty plea [did] not exist." Id., Dkt. No. 588 at 1. The petitioner then retained Attorney Donovan and

proceeded with sentencing. The petitioner expressed satisfaction with Richards during the plea hearing and with Donovan at sentencing. Despite having the benefit of the opinions of three different lawyers, at no time did the petitioner ask the court to withdraw his plea even though he says he alerted Richards to the issue prior to the plea hearing and discussed it with his second and third attorneys prior to sentencing.

With or without the wiretap evidence, the petitioner cannot establish prejudice. In cases like this, where the defendant has accepted a plea deal, a "mere allegation by the defendant that he would have insisted on going to trial is insufficient to establish prejudice." United States v. Fudge, 325 F.3d 910, 924 (7th Cir. 2003) (citing Barker v. United States, 7 F.3d 629, 633 (7th Cir. 1993)). Rather, a petitioner is required to establish through objective evidence, beyond his own bare assertion, that a reasonable probability exists that he would have gone to trial. Id. (citing McCleese v. United States, 75 F.3d 1174, 1179 (7th Cir. 1996); Arango-Alvarez v. United States, 134 F.3d 888, 893 (7th Cir. 1998); United States v. Arvanitis, 902 F.2d 489, 495 (7th Cir. 1990)). The petitioner has failed to provide that objective evidence. He acknowledges that Terrance Hamlin, his co-defendant, testified at the trial of Royel Page and identified the petitioner as his supplier and explained what he purchased from the petitioner and when. See Page, Case No. 17-cr-175, Dkt. No. 613 at 11-16. The petitioner also is aware that the government dismissed the other counts against him because of the plea agreement but could have proceeded with the firearms count or filed a second superseding indictment charging the petitioner

with fleeing from prosecution. In addition, the government could have filed an information under 21 U.S.C. §851 based on the petitioner's criminal history; such a filing would have subjected the petitioner to increased mandatory minimum and maximum sentences.

The petitioner throws in an argument that Richards pressured him by saying that there was a short time frame and that the government could withdraw the plea and charge the petitioner as a career offender. Dkt. No. 14 at 6. When the petitioner signed the plea agreement, he acknowledged that "no threats, promises, representations, or other inducements" were made and that he was pleading guilty freely and voluntarily. Harris, Case No. 17-cr-175, Dkt. No. 609 at 16. Because the petitioner cannot satisfy his burden under Strickland, the court will deny his motion to vacate, set aside or correct his sentence.

## III. Certificate of Appealability

Under Rule 11(a) of the Rules Governing Section 2255 Proceedings, "the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A court may issue a certificate only if the applicant makes a substantial showing of the denial of a constitutional right." See 28 U.S.C. § 2253(c)(2). The standard for making a "substantial showing" is whether "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Slack v. McDaniel, 529 U.S. 473, 484 (2000) (internal quotations omitted). The

court declines to issue a certificate of appealability because, on this record, reasonable jurists could not debate that the petitioner is not entitled to *habeas* relief under 28 U.S.C. § 2255.

## IV. Conclusion

The court **DENIES** the petitioner's motion to vacate, set aside or correct his sentence under 28 U.S.C. § 2255. Dkt. No. 1.

The court **DECLINES TO ISSUE** a certificate of appealability.

The court orders that the case is **DISMISSED**. The clerk will enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 28th day of August, 2026.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**